# Exhibit A

# BOTTINI & BOTTINI, INC.

Francis A. Bottini, Jr.

writer's direct:  (858) 926-2610
fbottini@bottinilaw.com

January 30, 2025

**VIA FEDERAL EXPRESS**

Abbott Laboratories
Board of Directors
100 Abbott Park Road
Abbott Park, IL 60064-6400



**Re:**    **Stockholder Litigation Demand**

Dear Board of Directors:

We represent Mr. Matthew Steele, a current stockholder of record of Abbott Laboratories.  Mr. Steele has previously conducted a stockholder inspection demand under Illinois law and reviewed relevant Board of Director minutes and packages.   Based on his thorough investigation, Mr. Steele hereby demands that the Board of Directors of Abbott Laboratories take action to address the matters contained in this letter regarding suspected wrongdoing by the officers and directors of Abbott Laboratories (the "Demand").

## I.    STOCKHOLDER DEMANDS THAT ABBOTT'S BOARD OF DIRECTORS DISSOLVE THE SPECIAL LITIGATION COMMITTEE COMPOSED OF DIRECTOR O'GRADY

As you are aware, shareholder derivative claims are pending in the Northern District of Illinois against certain officers and directors of Abbott related to Abbott's manufacture and sale of tainted baby formula. *In re Abbott Laboratories Infant Formula Shareholder Derivative Litigation*, No. 1:22-cv-05513. On August 7, 2024, the Court granted in part and denied in part the Defendants' Motion to Dismiss. Mem. Op. 1, ECF No. 142. The Court dismissed Counts I, IV, V, VI and VII without prejudice. *Id.* The Court denied the motion to dismiss Counts II and III,  Abbott's Board of Directors, concluding that Plaintiffs had sufficiently carried their burden at the pleading stage of alleging demand futility. *Id.* at 14, 25.

In response, Abbott's Board of Directors appointed a Special Litigation Committee ("SLC") at its September 19, 2024 meeting, consisting of Director Michael G. O'Grady, to "investigate and evaluate the claims asserted in the [Action], and to prepare such reports, arrive at such decisions, and take such other actions in connection with the [Action] as the Special Litigation Committee deems appropriate and in the best interests of the Company and its shareholders[.]" *See* Declaration of Benjamin L. Hatch ("Hatch Decl."), Ex. A at 12.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 2

Abbott's Board delegated "sole and exclusive authority" to the SLC "to take any such action(s), including, without limitation, directing the filing and prosecution of litigation on behalf of the Company, as the Special Litigation Committee in its sole discretion deems to be in the best interest of the Company." The Board further resolved to give the SLC the exclusive power and authority to take any and all actions it deemed necessary or appropriate to accomplish its functions, including hiring its own counsel, incurring expenses on behalf of Abbott in connection with its activities, conducting interviews, and accessing Company information. *Id.* The SLC has retained McGuireWoods as its counsel and has begun its investigation.

Mr. Steele demands that the Boad immediately dissolve the SLC since there is no authority under Illinois law for Abbott to form a SLC, nor delegate plenary, full, and exclusive authority to investigate and pursue the relevant shareholder derivative claims. Unlike Delaware, which has a statute authorizing SLCs (see 8 Del. C. §141(c)), Illinois has no such statute. Delaware law does not control in this situation because Abbott is an Illinois corporation, not a Delaware corporation. Further, Delaware's caselaw in the SLC context is not persuasive in light of the fact that the Delaware Legislature passed a statute authorizing SLCs but Illinois' Legislature did not. It is not the province of the courts to make laws.

In support of its Motion to Stay the derivative suit, filed November 19, 2024, the SLC's counsel at McGuire Woods cited to both 8 Del. C. §141(c) and 805 Ill. Comp. Stat. 5/8.05, which only proves the point. Unlike 8 Del. C. §141(c), 805 Ill. Comp. Stat. 5/8.05 contains no provision authorizing the appointment of a SLC. To the contrary, it explicitly states that "the business and affairs of the corporation shall be managed by or under the direction of the board of directors." Thus, Illinois law requires that Abbott's full Board, not a single-member SLC, manage those derivative claims where the court has not already determined demand would be futile.

## II.    THE BOARD SHOULD WITHDRAW ITS MOTION TO STAY AND ALLOW THE PENDING SHAREHOLDER CLAIMS TO BE PURSUE BY THE SHAREHOLDER PLAINTIFFS

Here, the court determined that demand was futile with respect to Counts II and III. Moreover, the Board divested itself of authority to take any action with respect to those claims and the SLC, as noted supra, lacks authority under Illinois law. Thus, the pending Motion to Stay should be withdrawn and those claims should be allowed to continue to be litigated by shareholders, including Mr. Steele, who is the only shareholder of record in the case.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 3

### III. THE FULL BOARD OF DIRECTORS SHOULD INVESTIGATE AND PURSUE COUNTS I, IV, V, VI, AND VII IN THE PENDING CONSOLIDATED DERIVATIVE COMPLAINT

The court did not find that demand would be futile with respect to Counts I, IV, V, VI and VII. Mr. Steele therefore demands that the full board investigate and pursue those claims. Since there is no authority under Illinois law to form a SLC, the improperly constituted SLC consisting of Mr. O'Grady should be dissolved. Allowing Mr. O'Grady to waste Abbott's resources and incur substantial attorney fees from the McGuire Woods law firm would constitute corporate waste (and therefore constitute a separate breach of fiduciary duty by the Board) since no recommendation or determination by the SLC would be enforceable in any court due to the lack of any authority under Illinois law to form a SLC and/or delegate full and exclusive authority to the SLC. If the Company refuses to dissolve the SLC, Stockholder will construe such refusal as a refusal of this Demand.

### IV. RELEVANT INDIVIDUALS SUSPECTED OF WRONGDOING

Stockholder demands that the Board of Directors investigate and take suitable action against the following individuals, hereinafter referred to as the "Individual Defendants."

*Officers and Directors of Abbott Laboratories*

Robert B. Ford ("Ford") is Abbott's Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO"). Ford was appointed as the Company's CEO in March 2020 and became Chairman in December 2021. Ford is a citizen of Illinois.

Robert J. Alpern, M.D. ("Alpern") is, and at all times relevant hereto has been, a director of Abbott. Alpern is a member of the Nominations and Governance Committee and the Public Policy Committee. Alpern is a citizen of Connecticut.

Roxanne S. Austin ("Austin") served as a Director of Abbott during the Relevant Period from 2000 to 2022. Austin served as a member of the Company's Compensation (Chair), Nominating and Governance, and Executive Committees. Austin also serves on the Boards of Abbvie and Verizon. Austin is a citizen of California.

Sally E. Blount, Ph.D. ("Blount") is, and at all times relevant hereto has been, a director of Abbott. Blount is a member of the Nominations and Governance Committee and the Public Policy Committee. Blount is a citizen of Illinois.

Paola Gonzalez ("Gonzalez") is, and at all times relevant hereto has been, a director of Abbott. Gonzalez is a member of the Audit Committee. Gonzalez is a citizen of California.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 4


Michelle A. Kumbier ("Kumbier") is, and at all times relevant hereto has been, a director of Abbott. Kumbier is a member of the Audit and Compensation Committees. Kumbier is the Senior Vice President and President, Turf & Consumer Products of Briggs & Stratton, LLC. Kumbier is a citizen of Wisconsin.

Darren W. McDew ("McDew") is, and at all times relevant hereto has been, a director of Abbott. McDew is a member of the Nominations and Governance Committee and the Public Policy Committee, and Audit and Compensation Committees. McDew is a citizen of North Carolina.

Nancy McKinstry ("McKinstry") is, and at all times relevant hereto has been, a director of Abbott. McKinstry is Chair of the Audit Committee, and a member of the Compensation and Executive Committees. McKinstry is also Chief Executive Officer and Chairman of the Executive Board of Wolters Kluwer N.V. and a board member of Accenture. McKinstry is a citizen of the Netherlands.

William A. Osborn ("Osborn") is, and at all times relevant hereto has been, a director of Abbott. Osborn is Chair of the Nominations and Governance Committee, and a member of the Compensation and Executive Committees. Osborn is a citizen of Illinois.

Michael F. Roman ("Roman") is, and at all times relevant hereto has been, a director of Abbott. Roman is a member of the Audit and Compensation Committees. Roman has also been Chairman of the Board, President and Chief Executive Officer of 3M Company since May 2019. Roman is a citizen of Minnesota.

Daniel J. Starks ("Starks") is, and at all times relevant hereto has been, a director of Abbott. Starks is a member of the Public Policy Committee. Starks is a citizen of Minnesota.

John G. Stratton ("Stratton") is, and at all times relevant hereto has been, a director of Abbott. Stratton is a member of the Audit and Public Policy Committees, and a member of the Compensation and Executive Committees. Stratton has also served as the Executive Chairman of Frontier Communications Parent, Inc. since April 2021. Stratton is a citizen of Connecticut.

Glenn F. Tilton ("Tilton") is, and at all times relevant hereto has been, a director of Abbott. Tilton is Chair of the Public Policy Committee, the Audit Committee, and the Executive Committee. Tilton also serves as Chairman, President and Chief Executive Officer of UAL Corporation, an airline holding company, and sits on the Boards of Abbvie and Phillips 66. Tilton also serves on the board of trustees for the Field Museum and the Museum of Science and Industry, and the board for the Economic Club of Chicago, the Executives' Club of Chicago, and After

Abbott Laboratories
Board of Directors
January 30, 2025
Page 5

School Matters, as well as on the civic committee of the Commercial Club of Chicago. Tilton is a citizen of Illinois.

Lori J. Randall ("Randall") is Abbott Nutrition's Division Vice-President of Quality Assurance. Defendant Randall has overall responsibility for quality operations for global Abbott Nutrition, which includes, but is not limited to, oversight of manufacturing locations and food safety, product quality, supplier quality, compliance, complaint management, and corrective and preventive actions. Defendant Randall was responsible for approving the decision made during the FDA's inspection at Sturgis to initiate a recall of certain infant formulas manufactured at Sturgis. Defendant Randall performs her duties at Abbott Laboratories' corporate office located in Abbott Park, Illinois, where she conducts her oversight duties for Abbott Laboratories' manufacturing sites including, but not limited to, the Sturgis facility. Randall is a citizen of Michigan.

Keenan S. Gale ("Gale") holds the title of Director of Quality at Sturgis and oversees all quality assurance including, but not limited to, sanitation, compliance, and corrective and preventive actions. Defendant Gale has the authority to detect, correct, and prevent violations of the FDA and its implementing regulations. Defendant Gale performs his duties at Sturgis's location. Gale is a citizen of Michigan.

TJ Hathaway ("Hathaway") is the Site Director at Sturgis. Defendant Hathaway has identified himself as the most responsible individual at the Sturgis facility. Defendant Hathaway is responsible for ensuring the safety and quality of products made at Abbott's Sturgis plant. Defendant Hathaway performs his duties at Abbott's Sturgis plant. Hathaway is a citizen of Michigan.

Robert E. Funck, Jr. ("Funck") is, and at all times relevant hereto has been, Abbott's Chief Financial Officer ("CFO") and Vice President, Finance since March 2020. Funck is a citizen of Illinois.

Joseph Manning ("Manning") is, and since December 2021 has been, Abbott's Executive Vice President, Nutritional Products. Manning is a citizen of Illinois.

Christopher J. Calamari ("Calamari") is, and at all times relevant hereto has been, Abbott's President of Nutrition, North America and Senior Vice President for U.S. Nutrition. Calamari is a citizen of Illinois.

Claire Babineaux-Fontenot ("Babineaux-Fontenot") has served on the Abbott Board since September 2022, and earned over $31,000 in compensation for her

service in 2022. She serves on the Public Policy Committee.

Edward M. Liddy ("Liddy") served on the Abbott Board from 2010 to 2021. He chaired the Audit Committee, and also served on the Compensation and Executive Committees.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 6

Liddy was most recently a partner at Clayton, Dubilier & Rice, LLC, a private equity firm. He also previously served on the board of Abbvie, 3M Company, and the Boeing Company (and was a defendant in a derivative action against Boeing, a 2020 lawsuit alleging Boeing's officers and directors failed to monitor for aircraft safety that resulted in a historic settlement). In 2019 through 2020, Liddy received a total compensation package worth more than $700,000 from Abbott.

Phebe N. Novakovic ("Novakovic") was an Abbott director from 2010 to April 2021. Novakovic served as the Chair of the Public Policy Committee in 2019 and 2020, and also served as a member of the Compensation and Executive Committees. She is the Chair and CEO of General Dynamics, a defense contractor, and also serve on the board of JP Morgan Chase. From 2019 through 2021, Novakovic received a total compensation package worth over $680,000 from Abbott.

Miles D. White ("White") joined Abbott in 1984, served as Abbott's Chairman and Chief Executive Officer from 1999 to 2020 and was Executive Chairman of the Board from 2020 to 2021. White serves on the board of McDonalds Corporation and previously served on the board of Caterpillar, Inc. He was a chairman of the Federal Reserve Bank of Chicago and the Pharmaceutical Research and Manufacturers of America. From 2019 through 2021, White received a total compensation package worth more than $63.5 million from Abbott.

Erica Battaglia ("Battaglia") has served as Abbott's Chief Ethics and Compliance Officer since June 2021.

James E. Young ("Young") has served as Abbott's Chief Ethics and Compliance Officer ("CECO") from July 2015 to May 2021.

J. Scott House ("House") has served as Abbott's Senior Vice President of Quality Assurance, Regulatory and Engineering Services since March 2020. House joined Abbott in 1990. According to House's biography on Abbott's website, House and his team are responsible for "ensuring that Abbott's quality, regulatory and engineering values are consistently applied across the corporation, helping ensure the highest quality products for our customers, strict compliance with global regulatory requirements, and a safe environment...."

Daniel Salvadori ("Salvadori") has served as the Executive Vice President and Group President, Established Pharmaceuticals and Nutritional Products from 2021, and from 2017 to 2021 served as the Executive Vice President of Nutritional Products. In that role he was "responsible for defining the strategic vision for both of these businesses and leading efforts to conduct innovative research and science-based products and medicines for people of all ages." From 2019 through 2022, Salvadori received a total compensation worth more than $26.6 million from Abbott.

Michael G. O'Grady is a current director of Abbott and Chairman and Chief Executive Officer of Northern Trust Corporation. Northern Trust provides investment services to Abbott, including the provision of funds and brokerage services to the Abbott Laboratories Stock Retirement Plan.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 7

## V.     <u>THE FACTS AND WRONGDOING RELEVANT TO THE CLAIMS</u>

### I.     Facts Germane to Breaches of Fiduciary Duty

     As described in detail below, Stockholder has a credible basis to believe claims should be brought by the Company against Abbott Laboratories' officers and directors and senior executives for breaching their fiduciary duties to the Company's shareholders by engaging in wrongdoing in connection with the Company's conduct in producing powdered baby formula at its plant in Sturgis, Michigan.

     On August 7, 2024, the United States District Court for the Northern District of Illinois denied in part Abbott's motion to dismiss with respect to claims for breach of fiduciary duty against the Company's directors and denied the defendants' motion to dismiss as to claims under Section 10(b) related to repurchase of the Company's stock. With respect to the other alleged claims, including proxy law violations and insider trading, the Court did not determine that the claims were not meritorious, only that the plaintiffs had not adequately alleged demand futility. Since the Company is not required to comply with such pleading hurdle if it brings the claims directly, Stockholder demands that the Company perform a fulsome and comprehensive investigation of the merits of such claims and bring all claims it deems meritorious against the individuals identified in this litigation demand.

     On January 20, 2023, it was reported that Abbott is under ***criminal investigation*** by the United States Department of Justice for manufacturing tainted baby formula, which resulted in the death of at least nine children. *See* "Abbott Under Federal Criminal Investigation Over Baby Formula," THE WALL STREET JOURNAL, Jan. 20, 2023; *see also* "DOJ Launches Criminal Investigation Into Abbott Over Baby Formula Crisis," THE HILL, Jan. 21, 2023. *See also* Kevin Reed, "Seven More Children Died After Consuming Baby Formula Produced at Contaminated Abbott Labs Factory in Michigan," WSWS.ORG, June 12, 2022 ("According to newly released documents, nine children have died since 2021 after consuming powdered baby formula produced by Abbott Labs at its pediatric nutritionals factory in Sturgis, Michigan, seven more than had been previously acknowledged by the U.S. Food and Drug Administration (FDA).").

     Previously, the Food and Drug Administration (FDA) had announced in February 2022 that it found evidence of unsanitary conditions at the Sturgis plant and that multiple strains of bacteria that can be deadly to infants were present at the facility. It was also revealed that Abbott had previously identified incidents of contamination, necessitating the destruction of such contaminated products.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 8

The deadly strains of bacteria found by the FDA at Abbott's Sturgis plant were Cronobacter sakazakii. Cronobacter infections are rare and can be deadly in newborns. Only about two to four cases are reported to the CDC every year, but this figure may not reflect the true number of illnesses.

Cronobacter germs can cause a dangerous blood infection called sepsis. They can also make the linings surrounding the brain and spinal cord swell (meningitis).

In light of these serious and potentially fatal risks to babies, the federal government's actions resulted in the closure of the Sturgis plant for a period of time in 2022.

Evidence also exists that, in connection with the FDA inspections and the subsequent recalls, Abbott's officers and directors breached their duty of loyalty by making false and incomplete statements to the public. On February 17, 2022, Abbott issued a press release recalling its baby formula from the Sturgis plant. In the February 17 press release, Abbott reported that: "During testing in our Sturgis, Mich., facility, we found evidence of Cronobacter sakazakii in the plant *in non-product contact areas*" (emphasis added). However, the FDA inspection report released on March 22, 2022 contradicted that assertion, stating that Cronobacter was detected on a "scoop hopper" that was "*utilized to feed scoops, which are placed directly inside infant formula containers and contact product*" (emphasis added).

Likewise, Abbott stated on February 17, 2022, that "While *Abbott's testing of finished product detected no pathogens*, we are taking action by recalling the powder formula manufactured in this facility with an expiration of April 1, 2022, or later" (emphasis added). Yet just a little over one month later, the FDA reported that "both FDA and [Abbott] found evidence of Cronobacter spp. in your powdered infant formula production environment. [Abbott] also identified Cronobacter spp. *in finished powdered infant formula products*" (emphasis added).

The Company's February 17, 2022 statements falsely downplayed the danger Abbott's infant formula posed to babies at a time when Abbott's infant formula was still for sale on store shelves and being used in the homes of thousands of families at the time. Instead of disclosing the full truth of the threat posed by Abbott's products, Mr. Manning stated in the press release that: "We know parents depend on us to provide them with the highest quality nutrition formulas," said Joe Manning, executive vice president, nutritional products, Abbott. "We're taking this action so parents know they can trust us to meet our high standards, as well as theirs. We deeply regret the concern and inconvenience this situation will cause parents, caregivers and health care professionals."

In May 2022, Abbott was forced to enter into a consent decree with the U.S. Department of Justice. Abbott's Board thus had actual knowledge of the life-threatening problems with the Company's Sturgis facility and assumed direct responsibility for ensuring the Company's

Abbott Laboratories
Board of Directors
January 30, 2025
Page 9

compliance with the consent decree.[1]   As a sign of the Board's responsibility for compliance, Abbott's Chairman and CEO Ford, was quoted in a May 16, 2022 press release by Abbott announcing the consent decree, in which Ford said "Our number one priority is getting infants and families the high-quality formulas they need, and this is a major step toward re-opening our Sturgis facility so we can ease the nationwide formula shortage. We look forward to working with the FDA to quickly and safely re-open the facility."[2]

In the complaint accompanying that consent decree, the Justice Department said Abbott and several of its employees (including Lori J. Randall, Keenan S. Gale, and TJ Hathaway) had caused "adulterated food" to enter interstate commerce.  "Ongoing inadequacies in manufacturing conditions and practices at Defendants' facilities demonstrate that Defendants have been unwilling or unable to implement sustainable corrective actions to ensure the safety and quality of food manufactured for infants, a consumer group particularly vulnerable to foodborne pathogens," the Justice Department said in the complaint.

About two weeks after the consent decree was signed, FDA Commissioner Dr. Robert Califf gave sworn testimony in which he stated, "*We had no confidence in the integrity of the quality program at the facility*." Dr. Califf also described bacteria growing in multiple sites within the complex, cracks in key equipment, leaks in the roof, standing water and inadequate handwashing by staff.

Abbott was allowed to reopen the Sturgis plant in June 2022, subject to its obligation to comply with the consent decree.  The Board of Directors had direct responsibility for ensuring compliance with the consent decree.  The Board was also well aware of how failure to ensure sanitary conditions at Sturgis could lead to the death of babies, materially adverse fines, sanctions, and even criminal penalties.  That same year, Chipotle Mexican Grill Inc. said it would pay a record $25 million to resolve criminal charges stemming from a series of foodborne-illness outbreaks involving its restaurants that sickened more than 1,000 people.

---

[1] Under the consent decree, Abbott must retain outside expert assistance to bring its facility into compliance with the FDCA and good manufacturing practice regulations. Among other things, the expert will assist Abbott, under FDA supervision, in the development of plans designed to reduce and control the risk of bacterial contamination, and will periodically evaluate Abbott's compliance with the FDCA, regulations, and the consent decree.

[2] *See* "Abbott Enters into Consent Decree with U.S. Food and Drug Administration for its Sturgis, Mich., Plant," PR NEWSWIRE, May 16, 2022, available at https://www.prnewswire.com/news-releases/abbott-enters-into-consent-decree-with-us-food-and-drug-administration-for-its-sturgis-mich-plant-agreement-creates-pathway-to-reopen-facility-301548354.html, last visited Feb. 1, 2023.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 10

In addition to the DOJ criminal investigation, Abbott has been named as a defendant in numerous consumer lawsuits that allege that babies developed necrotizing enterocolitis as a result of consuming Abbott's powdered baby formula.

In January 2022, the U.S. Judicial Panel on Multidistrict Litigation was asked to consolidate the consumer cases brought in federal court for pretrial purposes. The MDL subsequently granted the motion for consolidation and the cases are pending in U.S. District Court for N.D. Ill. under the caption *In re Recalled Abbott Laboratories et al. Infant Formula Products Liab. Litig.*, Case No. 22-cv-2148, MDL No. 3037 (N.D. Ill.).[3]

On February 17, 2022, Abbott issued a recall of various infant formula products manufactured at the Sturgis facility, including Similac, Alimentum, and EleCare. Abbott did not disclose the existence of the FDA investigation, instead portraying the recall as a proactive measure to protect the public.

As a result of the FDA inspection which discovered the existence of the Cronobacter bacteria at the Sturgis plan, Abbott was forced to close the Sturgis facility. Abbott is one of four major companies that control some 90 percent of the infant formula supply in the United States. The closure of the plant worsened a nationwide shortage that left parents unsure where they would find more baby formula.

In May 2022, the White House invoked the Defense Production Act to help baby formula manufacturers obtain necessary ingredients and launched Operation Fly Formula, importing product from around the world to stock store shelves. Those efforts offered some help, but there were still widespread shortages on grocery shelves.

On March 22, 2022, the FDA released reports from three inspections of the Sturgis facility conducted in September 2019, September 2021 and, most recently, between January 31, 2022 and March 18, 2022. The FDA reports concluded that (a) Abbott failed to establish process controls "designed to ensure that infant formula does not become adulterated due to the presence of microorganisms in the formula or in the processing environment" and (b) Abbott failed to "ensure that all surfaces that contacted infant formula were maintained to protect infant formula from being contaminated by any source."

---

[3] Lawsuits were also filed, and are pending, in Canada, seeking to represent a class of Canadian infants who suffered similar injuries after ingesting Abbott's baby formula. The Canadian lawsuits seek various damages, including punitive damages from Abbott's concealment of violations of safety protocols at the Sturgis facility that resulted in the development of Cronobacter sakazakii bacteria.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 11

In response to the disclosure of these reports, Abbott's stock price dropped $4.97 per share, or 4%, from a closing price of $121.89 per share on March 22, 2022, to a closing price of $116.92 per share on March 23, 2022.

On April 28, 2022, a redacted copy of a 34-page whistleblower complaint sent to the FDA in October 2021 was made public.

The whistleblower employee worked in Quality Systems ("QS"), a subunit of the Quality Assurance organization ("QA") in Sturgis, Michigan ("Sturgis site") as part of Abbott's Nutritional Division. The whistleblower alleged that Abbott's management was aware of health and safety issues at the Sturgis facility well before the FDA inspection, and that Abbott management falsified test records and released untested infant formula to the market. In addition, the whistleblower alleges that Abbott management attempted to mislead the FDA during a 2019 inspection audit about serious existing safety problems with the Company's baby formula. The whistleblower complaint also details additional wrongdoing by Abbott management at Sturgis, including the falsification of testing records, the release of untested baby formula to the market, and Abbott's efforts to mislead the FDA during its 2019 inspection audit.

In March 2022 testimony before a House of Representatives Subcommittee, FDA Commissioner Dr. Robert Califf stated that there was bacteria growing at multiple sites in the Sturgis facility, cracks in key equipment, roof leaks, and standing water which were unsanitary. Dr. Califf stated that FDA had lost confidence that the Company had "the appropriate safety and quality culture and commitment to fix these problems quickly."

On May 17, 2022, the Senate Finance Committee requested information on how much Abbott spent on upgrades to its Sturgis facility prior to its closure due to bacterial contamination, and whether the Company used billions in tax cuts to repurchase its stock instead of investing in the Sturgis facility. Committee Chairman, Sen. Ron Wyden, sent a letter to Abbott's Chief Executive Officer, Robert B. Ford, which stated "[a]s Abbott spent billions buying back its own stock, it appears that it failed to make necessary repairs to fix a critical manufacturing plant of infant formula located in Michigan . . . [t]he closure of the plant has contributed substantially to a national shortage of infant formula, putting families across the country at risk."

On May 25, 2022, Calamari testified on behalf of Abbott at a hearing concerning the baby formula shortage held by the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. During his testimony, Calamari repeatedly stated that Abbott was unaware of the whistleblower's complaints until late April 2022, when the complaint submitted to the FDA was publicly disclosed by a member of Congress. For example, Calamari stated:

Abbott did not find out about it [the whistleblower complaint] until it was made public in the end of April and it was the particular individual who raised the

Abbott Laboratories
Board of Directors
January 30, 2025
Page 12

complaint . . . it was their choice to use that mechanism to raise the complaint.

This and similar statements made by Mr. Calamari during the May 25, 2022 congressional hearing were false and misleading when made. On June 8, 2022, it was disclosed that the Company was aware of the allegations in the whistleblower complaint in early 2021, when the complaint was filed with the U.S. Labor Department's Occupational Safety & Health Administration ("OSHA") and delivered to both Abbott and the FDA. The Company's response was submitted two months later.

The news that Abbott received the whistleblower's complaint in early 2021 revealed that executives at Abbott's highest levels were informed of the safety violations one year prior to the formula recall, despite statements denying any knowledge of the whistleblower's complaints prior to April 2022. This news caused a precipitous decline in the market price of Abbott common stock. Specifically, in response to these disclosures, the price of Abbott common stock declined $4.17 per share, or 3.5%, from a closing price of $116.88 per share on June 7, 2022, to a closing price of $112.71 per share on June 9, 2022. The stock continued to decline in the following months, eventually reaching as low as $93.

## THE OFFICER DEFENDANTS ACTED IN BAD FAITH AND BREACHED THEIR DUTY OF LOYALTY TO ABBOTT, RESULTING IN A CONSENT DECREE BEING IMPOSED ON THE COMPANY

Abbott's Officers had direct responsibility for operation of the Sturgis facility and/or supervision and public reporting obligations about Sturgis. As a result, when the FDA, through the Justice Department, filed suit against Abbott as part of the negotiated consent decree, it also sued Defendants Randall, Hathaway, and Gale because their breaches of duty to Abbott led directly to the contamination of baby formula at Sturgis.

Randall is Abbott Nutrition's Division Vice-President of Quality Assurance. Defendant Randall has overall responsibility for quality operations for global Abbott Nutrition, which includes, but is not limited to, oversight of manufacturing locations and food safety, product quality, supplier quality, compliance, complaint management, and corrective and preventive actions. Defendant Randall was responsible for approving the decision made during the FDA's inspection at Sturgis to initiate a recall of certain infant formulas manufactured at Sturgis. Defendant Randall performs her duties at Abbott Laboratories' corporate office located in Abbott Park, Illinois, where she conducts her oversight duties for Abbott Laboratories' manufacturing sites including, but not limited to, the Sturgis facility.

Gale holds the title of Director of Quality at Sturgis and oversees all quality assurance including, but not limited to, sanitation, compliance, and corrective and preventive actions. Defendant Gale has the authority to detect, correct, and prevent violations of the FDA and its implementing regulations. Defendant Gale performs his duties at Sturgis's location.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 13

Hathaway is the Site Director at Sturgis. Defendant Hathaway has identified himself as the most responsible individual at the Sturgis Facility. Defendant Hathaway is responsible for ensuring the safety and quality of products made at Abbott's Sturgis plant. Defendant Hathaway performs his duties at Abbott's Sturgis plant.

As alleged by the DOJ, Hathaway, Gale, and Randall, through their acts and omissions as officers of Abbott, likely violated 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of food, namely baby formula, that were adulterated within the meaning of 21 U.S.C. § 342(a)(4).

Hathaway, Gale, and Randall likely violated 21 U.S.C. § 331(k) by causing articles of food that are held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(a)(4).

Through their conduct, Hathaway, Gale, and Randall breached their duties of good faith, loyalty, and honest services to Abbott, causing substantial harm and damage to Abbott. Abbott was forced to enter into a consent decree with the FDA and DOJ which imposes burdensome and expensive obligations on Abbott, including retaining an expert and making periodic reports to the government. *See* May 16, 2022 Consent Decree.

Funck is, and at all times relevant hereto has been, Abbott's Chief Financial Officer ("CFO") and Vice President, Finance since March 2020. Funck caused Abbott to issue false and misleading statements about its operations during the time he was aware of material problems at the Sturgis facility.

Manning is, and since December 2021 has been, Abbott's Executive Vice President, Nutritional Products. As alleged *supra*, Manning made false and misleading statements about the recall and the operations at Sturgis, and failed to reveal the full extent of problems at Sturgis.

Calamari is, and at all times relevant hereto has been, Abbott's President of Nutrition, North America and Senior Vice President for U.S. Nutrition. As alleged *supra*, Calamari made false and misleading statements about problems afflicting Sturgis as well as when the Company learned of the problems, including false statements he made on May 25, 2022 on behalf of Abbott at a hearing concerning the baby formula shortage held by the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.

### Abbott's Officers and Directors Engaged in Other Wrongdoing

Abbott's officers and directors have engaged in other violations of law, including the failure to warn of potentially adverse health effects of Abbott's baby formula. They have also

Abbott Laboratories
Board of Directors
January 30, 2025
Page 14

caused the Company to deceive consumers regarding the safety, efficacy, and equivalency of cow milk-based formula compared to breast milk.

Abbott has consistently advertised its cow-milk-based infant formulas as "safe" for pre-term infants to consume. Clinical studies and medical literature demonstrate, however, that cow-milk-based formulas are unsafe and unreasonably dangerous for feeding premature infants and make babies susceptible to a dangerously high risk of developing NEC, which is potentially fatal. NEC occurs when tissue in the colon becomes inflamed. The inflammation leads to necrosis of colon tissue, causing bacterial infections and cellular damage, cellular death, and necrosis of the colon and intestine. Even if an infant survives NEC, he or she is left with a lifetime of debilitating health problems that can severely restrict their long-term quality of life.

Abbott's failure to warn consumers about the potential for premature infants to contract NEC when ingesting its cow-milk based infant formulas has led to a large number of lawsuits against Abbott by the parents of deceased or disabled infants, who developed NEC after they drank Abbott's baby formula. In February 2023, in its annual report filed as Form 10-K to the SEC, Abbott disclosed that 399 of those lawsuits were pending in federal and state court, and Abbott also faced international lawsuits. Since then, the number of NEC-related lawsuits has more than doubled. In its Annual Report filed on Form 10-K on February 16, 2024, Abbott disclosed that "As of January 31, 2024, there were *993 lawsuits* pending in federal and state courts in which Abbott is a party. The plaintiffs seek various damages, including punitive damages."

In July 2023, in denying a motion to dismiss one of the MDL cases, Chief Judge Pallmeyer held that the plaintiffs had plausibly alleged that "Defendants knew of and disregarded the risks of using cow's milk in preterm infant formula[,]" and, therefore, could seek punitive damages from Abbott. *In re: Abbott Lab. Preterm Infant Nutrition Products Liability Litig.*, MDL No. 3026, No. 22-c-5325, 2023W WL 4564630, at *3 (N.D. Il. July 17, 2023). Thus, Abbott faces potentially hundreds of millions of dollars, or even billions of dollars of liability, when accounting for punitive damages related to world-wide litigation involving NEC.

The Company's Directors also likely violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Abbott to issue proxy statements in 2021, 2022, and 2023 that failed to disclose, among other things, (1) the Company manufactured and sold its infant formula products in the U.S. in violation of federal health and safety laws and regulations; and (2) the seriously deficient internal risk management and controls that allowed those unsafe and illegal conditions to proliferate at Abbott, exposing Abbott to significant legal, regulatory, and reputational risks.

In November 2022, Abbott learned that the United States Department of Justice, through the United States Attorney's Office for the Western District of Michigan, is conducting a criminal investigation related to Abbott's manufacturing of infant formula. In December 2022, Abbott received a subpoena from the Enforcement Division of the Commission requesting information relating to Abbott's powder infant formula business and related public disclosures. In January 2023, Abbott received a civil investigative demand from the United States Federal Trade Commission seeking information in connection with its investigation of companies who participate

Abbott Laboratories
Board of Directors
January 30, 2025
Page 15

in bids for Women, Infants, and Children infant formula contracts. In addition, multiple civil lawsuits have been filed against Abbott relating to Abbott's manufacturing of certain powder infant formula products.

### Abbott Laboratories' Stock Repurchase Program

During the relevant time period, Abbott Laboratories was engaging in massive repurchases of its own stock at inflated prices.

On October 15, 2019, Abbott's Board authorized up to $3 billion in repurchases of its stock. On December 10, 2021, the board of directors authorized the repurchase of up to $5 billion of Abbott common shares, from time to time (the "2021 Plan").

The Directors knew or should have known that public disclosure of the material problems at Sturgis would likely lead to recalls, governmental investigations, consumer class action lawsuits, and a precipitous decline in Abbott's stock price. The Directors thus knew or should have known that it was not in Abbott's best interests to continue to repurchase its stock in massive quantities as they had been doing and intended to continue to do. Yet they did exactly that, voting to approve the $5 billion 2021 Plan and repurchase of massive quantities of company stock under the plan throughout the Relevant Period.

The Company's officers and directors, including Alpern, Austin, Blount, Calamari, Ford, Funck, Gonzalez, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Starks, Stratton, Tilton, and White caused the Company to make false and misleading statements in connection with the Company's repurchase of its own stock. The individuals' misrepresentations artificially inflated and/or maintained the price of Abbott shares, causing the Company to purchase shares at artificially high prices through its significant stock repurchase program.

For example, on February 20, 2020, the Company's directors named above caused Abbott to file it annual report on Form 10-K, which stated ***"no assurance can be given that Abbott will remain in compliance with applicable FDA and other regulatory requirements once approval or marketing authorization has been obtained for a product."*** In the Form 10-K, Abbott further represented that: "Abbott's facilities are deemed suitable and provide adequate productive capacity."

The same representations were made in the Form 10-K filed with the SEC on February 19, 2021, signed by Alpern, Austin, Blount, Ford, Funck, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Starks, Stratton, Tilton, and White, for the period ended December 31, 2020 (the "2020 Form 10-K"). The same representations were also made in the Form 10-K filed with the SEC on February 18, 2022, signed by Defendants Alpern, Austin, Blount, Ford, Funck, Gonzalez, Kumbier, McDew, McKinstry, Novakovic, Osborn, Roman, Starks, Stratton, and Tilton, for the period ended December 31, 2021 (the "2021 Form 10-K"). The statements above

Abbott Laboratories
Board of Directors
January 30, 2025
Page 16

(in the 2019, 2020 and 2021 Form 10-Ks) relating to Abbott's production and sales of infant formula were materially false and misleading including because:

• Abbott failed to manufacture and sell its infant formula products in a safe and legally compliant manner in the U.S.;

• Defendants knew or recklessly disregarded that employees, including those at the Sturgis Plant, were engaged in improper conduct allowing Abbott to produce and sell its infant formula products in the U.S. in unsafe and illegal ways, and they allowed it to continue;

• The Company's unsafe and illegal manufacture and sale of its infant formula products in the U.S. was, in material part, the result of oversight failures of Defendants, who in bad faith focused on generating revenues, and failed to implement an information reporting system to alert themselves of such unsafe and illegal activities, while ignoring any red flags they were presented with indicating an urgent need to oversee these issues;

• Defendants failed to implement the requisite risk controls to prevent or detect the Abbott's production and sale of infant formula products in the U.S. that, among other things, were unsafe and violated federal regulations;

• This illicit conduct occurred because compensation practices and the Company's business culture was structured such that employees felt pressured to violate federal laws to maximize the Company's profits related to its infant formula sales in the U.S.;

• Despite complaints from employee whistleblowers and customers, including multiple lawsuits and class actions; warnings from the FDA, including multiple Form 483s, media attention, and investigations or litigation by governmental entities (including the FDA, SEC, DOJ and the FTC), Defendants allowed the illegal activities to continue; and

• Contrary to Defendants' positive assertions that the production and sale of Abbott's infant formula is safe and in compliance with all laws, it was produced in violation of federal regulations and using unsafe practices.

In addition, Abbott's Code of Business Conduct was signed by Ford. It stated, among other things, "[w]e produce and deliver safe, effective products that people trust . . . We are committed to timely identifying, evaluating, and addressing product safety issues . . . We adhere to all laws, regulations and Abbott requirements that apply to our work."

These statements were false and misleading because Abbott failed to adhere to the FDCA regulations and internal controls that would ensure a safe and effective product and, unfortunately, Abbott delivered infant formula manufactured at the Sturgis Plant that has been linked to the deaths of multiple infants. Rather than "timely" address issues, Abbott pushed back against whistleblower complaints, failed to adhere to confidentiality norms that promote whistleblowing, and failed to elevate key concerns to the Board. Additionally, the FDA's findings in Form 483s and the Congressional testimony of FDA representatives reflect Abbott's noncompliance with applicable laws and regulations.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 17

Additionally, on July 16, 2021, Abbott published its Global Sustainability Report, affirmatively stating that its infant formula manufacturing processes were safe:

> Abbott's nutrition business ensures food safety through a tightly controlled manufacturing process that encompasses all steps from accepting materials from suppliers through to final product distribution. We monitor and verify microbiology, packaging integrity, and nutrient and lot control. We complete extensive finished product testing before releasing it for commercial distribution.

This statement was materially false or misleading because the Company did not ensure a "tightly controlled manufacturing process" that was "monitor[ed]" and "verif[ied]." Rather, the Sturgis Plant which produced a major portion of the Company's infant formula experienced for years standing water throughout the facility (a known contamination risk), had insufficient staffing, failed to consistently comply with record-keeping requirements, and failed to rigorously test infant formula before distribution.

The Global Sustainability Report further stated that Abbott conducts quality control to "ensure that [its quality-system performance model and metrics] continue to assess relevant quality and compliance risks." It also stated:

> Our global internal audit programs assess compliance with both regulatory standards and our own internal standards and processes. Our audits assess internal processes, such as design, production processes, supply chain, data integrity, corrective and preventive actions (CAPA), and complaint handling. Each of our operating businesses also performs internal quality audits in line with local regulatory requirements and then highlights any findings in management reviews. We develop correction plans to address any compliance issues our audits identify.

These statements were false or misleading because the Company did not ensure timely and accurate quality and compliance risk assessment, as demonstrated by the failure to rigorously test infant formula before distribution and to have an information reporting system for elevating critical information including Form 483s and whistleblower complaints to the Board.

Abbott's November 15, 2021 "2020 Sustainability Report Summary" contained similar representations including that Abbott conducts quality control to "ensure that [its quality system performance model and metrics] continue to assess relevant quality and compliance risks." It also stated:

> Our global internal audit programs assess compliance with both regulatory standards and our own internal standards and processes. Our audits assess internal processes, such as design, production processes, supply chain, data integrity, corrective and preventive actions (CAPA), and complaint handling. Each of our operating businesses also performs internal quality audits in line with local regulatory requirements and then highlights any findings in management reviews. We develop correction plans to address any compliance issues our audits identify.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 18

These statements were false or misleading because the Company did not ensure timely and accurate quality and compliance risk assessment, as demonstrated by the failure to rigorously test infant formula before distribution and to have an information reporting system for elevating critical information, including Form 483s and whistleblower complaints, to the Board.

Abbott's officers and directors also caused the Company to make numerous false and misleading statements following the February 17, 2022 recall.

The February 17, 2022, Abbott-issued press release (the "February 17, 2022 Press Release") stated:

> [Abbott] is initiating a proactive, voluntary recall of powder formulas, including Similac, Alimentum and EleCare manufactured in Sturgis, Mich., one of the company's manufacturing facilities . . . During testing in our Sturgis, Mich., facility, we found evidence of Cronobacter sakazakii in the plant in non-product contact areas.
>
> Importantly, no distributed product has tested positive for the presence of either of these bacteria, and we continue to test. Abbott conducts extensive quality checks on each completed batch of infant formula, including microbiological analysis prior to release. All finished products are tested for Cronobacter sakazakii, Salmonella Newport and other pathogens and they must test negative before any product is released. Additionally, retained samples related to the three complaints for Cronobacter sakazakii tested negative for Cronobacter sakazakii. . . . While Abbott's testing of finished product detected no pathogens, we are taking action by recalling the powder formula manufactured in this facility with an expiration of April 1, 2022, or later.

This statement was false or misleading because it omitted that the FDA had pushed for the recall and was conducting an ongoing investigation, as well as that the FDA inspection report dated March 18, 2022 and released publicly on March 22, 2022 stated that Cronobacter was found not only "in non-product contact areas" as asserted by Abbott but also on the "scoop hopper" that is "placed directly inside infant formula containers that contain product." As former FDA Deputy Commissioner Yiannis later testified on March 28, 2023 at a Congressional hearing, the "weight of the evidence" "supported a conclusion that [powdered infant formula] made at Abbott's Sturgis plant was produced under insanitary conditions and [was] a likely source of ongoing, sporadic contamination of [powdered infant formula] with multiple strains [of Cronobacter] over time."

On February 18, 2022, Abbott filed a Form 8-K with the SEC, signed by Defendant Ford, claiming: "On February 17, 2022, Abbott initiated a proactive, voluntary recall of Similac brand powder infant formulas manufactured in Sturgis, Michigan." That statement was false or misleading because it omitted that the FDA had pushed for the recall and was conducting an ongoing investigation.

Judge Harjani determined in his August 7, 2024 order denying Defendants' motion to

Abbott Laboratories
Board of Directors
January 30, 2025
Page 19

dismiss the Section 10(b) claim that "Since the Section 10(b) Defendants knew about the false statements and did nothing to stop them, they violated their own fiduciary duties and were not independent or disinterested. *Whitehall*, 2006 WL 468012, at *12. Since the Section 10(b) Defendants are alleged to be interested, then their knowledge is not imputed onto Abbott. *Ray*, 780 F.2d at 641." Dkt No. 142, at p. 13.

During Q1 2021, the Directors caused Abbott to make the following repurchases of company stock at the indicated prices:

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1, 2021 – January 31, 2021 | 1,785 (1) | $ 109.110 | 0 | $ 3,097,391,913 (2) |
| February 1, 2021 – February 28, 2021 | 10,000 (1) | 122.543 | 0 | 3,097,391,913 (2) |
| March 1, 2021 – March 31, 2021 | 0 (1) | 0 | 0 | 3,097,391,913 (2) |
| Total | 11,785 (1) | $ 120.509 | 0 | $ 3,097,391,913 (2 |

During the second quarter of 2021, the Directors caused Abbott to significantly increase its stock buyback efforts, resulting in the following repurchases of company stock at the indicated prices:

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| April 1, 2021 – April 30, 2021 | 18,202 | $ 120.900 | 0 | $3,097,391,913 |
| May 1, 2021 – May 31, 2021 | 0 | 0 | 0 | 3,097,391,913 |
| June 1, 2021 – June 30, 2021 | 4,500,000 | 111.575 | 4,500,000 | 2,595,306,483 |
| Total | 4,518,202 | $ 111.612 | 4,500,000 | $2,595,306,483 |

During the third quarter of 2021, the Directors authorized Abbott to further increase the number of shares repurchased, causing Abbott to make the following repurchases of company stock at the indicated prices:

| | (a) Total Number of | (b) Average | (c) Total Number of Shares (or Units) Purchased as Part of | Approximate Dollar Value) of Shares (or Units) that May Yet Be |
|---|---|---|---|---|

Abbott Laboratories
Board of Directors
January 30, 2025
Page 20

| Period | Shares (or Units) Purchased | Price Paid per Share (or Unit) | Publicly Announced Plans or Programs | Purchased Under the Plans or Programs |
|---|---|---|---|---|
| July 1, 2021 – July 31, 2021 | 450,000 | $ 120.849 | 450,000 | $2,540,924,508 |
| August 1, 2021 – August 31, 2021 | 2,175,000 | 123.265 | 2,175,000 | 2,272,822,841 |
| September 1, 2021 – September 30, 2021 | 3,002,035 | 120.814 | 3,000,000 | 1,910,394,012 |
| Total | 5,627,035 | $ 121.764 | 5,625,000 | $1,910,394,012 |

During the fourth quarter of 2021, the Directors authorized Abbott to make, and it did make, the following repurchases of company stock at the indicated prices:

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2021 — October 31, 2021 | 1,767,000 | $ 127.811 | 1,750,000 | $ 1,686,728,997 |
| November 1, 2021 — November 30, 2021 | 4,750,000 | $ 127.486 | 4,750,000 | $ 1,081,169,672 |
| December 1, 2021 — December 31, 2021 | 135 | $ 141.000 | 0 | $ 6,081,169,672 |
| Total | 6,517,135 | $ 127.575 | 6,500,000 | $ 6,081,169,672 |

Thus, during Q4 2021, Abbott repurchased its stock for an average of over $127 per share. When the wrongdoing came to light, Abbott's stock plunged and continued to decline, falling to as low as $93.25 per share by the fall of 2022. As a result, Abbott repurchased its stock at significantly inflated prices, causing hundreds of millions of dollars in harm to Abbott.

In the first quarter of 2022, the Directors authorized Abbott to significantly increase the number or shares repurchased, ***more than tripling the number of shares purchased in prior quarters and resulting in Abbott repurchasing over 17.3 million shares***, again at inflated prices, as follows:

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1, 2022 – January 31, 2022 | 650,000 | $ 127.262 | 650,000 | $5,998,449,112 |
| February 1, 2022 – February 28, 2022 | 8,550,000 | 123.643 | 8,550,000 | 4,941,301,237 |
| March 1, 2022 – March 31, 2022 | 8,113,060 | 118.344 | 8,113,060 | 3,981,169,070 |
| Total | 17,313,060 | $ 121.296 | 17,313,060 | $3,981,169,070 |

Abbott Laboratories
Board of Directors
January 30, 2025
Page 21

In the second quarter of 2022, Abbott abruptly discontinued its stock buyback program, and no shares were repurchased in April, May or June 2022.

However, during the Relevant Period, the Directors caused Abbott to repurchase 33,987,217 shares at inflated prices. Based on the average price paid by Abbott for such shares, and the lower $93.25 price that Abbott's stock declined to once the truth was revealed, the Directors' wrongful conduct in authorizing the stock repurchases during the Relevant Period resulted in damages of approximately $953,001,503, as reflected in the attached chart:

**Damages Caused to Abbott By the Directors Causing the Company to Repurchase Tens of Millions of Its Shares at Substantially Inflated Prices**

| Quarter | No. of Shares Repurchased | Average Price per share paid | Damages[4] |
|---|---|---|---|
| Q1 2021 | 11,785 | $120.50 | $321,141 |
| Q2 2021 | 4,518,202 | $111.61 | $82,954,188 |
| Q3 2021 | 5,627,035 | $121.76 | $160,426,768 |
| Q4 2021 | 6,517,135 | $127.57 | $223,668,073 |
| Q1 2022 | 17,313,060 | $121.29 | $485,631,333 |
| **TOTAL**: | 33,987,217 | | $953,001,503 |

## VI.  Causes of Action That Abbott Should Allow Stockholders to Continue to Pursue

As noted *supra*, since the court determined that demand was futile with respect to Counts II and III, and given the fact that the Board divested itself of authority to take any action with respect to those claims, the Company's pending Motion to Stay should be withdrawn and those

---

[4] Number of shares repurchased times difference between average price paid and $93.25.

Abbott Laboratories
Board of Directors
January 30, 2025
Page 22

claims should be allowed to proceed by shareholders, including Mr. Steele, who is the only shareholder of record in the case.[5]

### VII. Causes of Action That Abbott's Board Should Investigate and Pursue

Stockholder demands that Abbott's full Board dissolve the SLC and investigate and pursue the claims set forth in Counts I, IV, V, VI and VII of the derivative complaint.

In support of his litigation demand, Mr. Steele notes that he is a stockholder of record of the Company and thus the Company can verify his stock ownership by examining the list of shareholders within its possession and control. Mr. Steele has owned Abbott Laboratories stock continuously at all relevant times. Mr. Steele also notes that he has previously conducted a stockholder inspection demand under Illinois law and provided proof of his stock ownership in connection with that proceeding.

***Please respond to this litigation demand on or before February 14, 2025***. Should the Company refuse this lawful demand, Stockholder will avail himself of all remedies provided for under Illinois law, common law, and federal law.

If you have any questions, please call me at (858) 926-2610.

Very truly yours,

Francis A. Bottini, Jr.
for BOTTINI & BOTTINI, INC.

---

[5] While Illinois law provides that beneficial owners may pursue derivative claims upon application to and approval of the court, the current lead plaintiffs in the N.D. Ill. case never filed any application for leave to maintain the derivative claims in their capacity as beneficial owners. Thus, they also lack standing to pursue the claims. Mr. Steele, in contrast, is a shareholder of record and thus possesses undisputed standing to pursue the claims on the Company's behalf.

► Insert shipping document here.

4600 MON 02/03 06 58
100 ABBOTT PARK RD
60064-3502-00
NORTH CHICAGO,IL

324-5574
EIP 7    SP PD 100 Y    /71786518610

ORIGIN ID:SANA    (858) 914-2001
FRANK BOTTINI
BOTTINI & BOTTINI, INC.
7817 IVANHOE AVENUE
SUITE 102
LA JOLLA, CA 92037
UNITED STATES US

SHIP DATE: 30JAN25
ACTWGT: 0.10 LB
CAD: 104435776/INET4535

BILL SENDER

TO  **BOARD OF DIRECTORS**
**ABBOTT LABORATORIES**
**100 ABBOTT PARK ROAD**

**ABBOTT PARK IL 60064**
(858) 914-2001    REF: ABBOTT LABORATORIES
INV:
PO:    DEPT:

FedEx
Express

MON - 03 FEB 5:00P
** 2DAY **

60064
ORD
IL-US

FedEx
TRK# 7717 8651 8610
0201

ST FEPA

Scan to learn how we
can help make Earth
a priority together.

AP6D_02    02C11C
SERZYNSKI, KIMB
12246668588    0378
Plus4 6020    Bin AA203
Flag: 02    #PKGS
BOARD OF DIR.    1

USLCC00B6N
BSY3DS

2025 10:43:19 AM